546 So.2d 220 (1989)
Thomas Wayne ADDISON, Sr., et al., Daniel Smith, et al., Robert Michael Pike, Plaintiffs/Appellants,
v.
Cody Wayne WILLIAMS, et al., Defendants/Appellees.
Nos. 20449-CA, 20905-CA and 20906-CA.
Court of Appeal of Louisiana, Second Circuit.
June 14, 1989.
Writs Denied October 13, 1989.
*221 James Edward Franklin, Jr., Shreveport, for Thomas Wayne Addison, Sr.
Richie & Richie by Byron Richie, Shreveport, for Daniel Smith.
*222 Graves, Daye, Bowie, Beresko & Flowers by James W. Graves, Shreveport, Charles Brown, Bossier City, for Robert Michael Pike.
Cook, Yancey, King & Galloway by Samuel W. Caverlee, Shreveport, for Browning Arms Corp., and Fabrique Nationale Herstal.
Montgomery, Barnett, Brown, Read, Hammond & Mintz by James B. Irwin, New Orleans, for Olin Corp.
Mayer, Smith & Roberts by Mark A. Goodwin, Shreveport, for City of Bossier City & Bossier City Fire Dept.
Hicks & Bookter by Claude W. Bookter, Jr., Shreveport, Billy Ross Robinson, Bossier City, for Mr. & Mrs. W.H. Hardin.
Wildman, Harrold, Allen & Dixon by James P. Dorr, Sarah Olson, Chicago, Ill., Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot by Paul B. Deal, New Orleans, for Colt Industries, Inc.
Before HALL, C.J., and SEXTON and LINDSAY, JJ.
HALL, Chief Judge.
On New Years Eve 1986, shortly before midnight, Cody Wayne Williams caused a disturbance at the Hub Lounge in Bossier City. Employees of the lounge took a handgun from him, and he was ordered to leave the premises. To protect themselves, customers and employees closed and locked the two steel doors to the lounge. Williams returned to the lounge with a Colt AR-15 model SP1 semi-automatic rifle and opened fire on the lounge, firing 55 rounds of .223 caliber ammunition into the building through the steel doors. Bullets and bullet fragments struck six of the occupants of the lounge, fatally injuring one person and injuring five others. Williams later pled guilty to first degree murder and is serving a life sentence in the state penitentiary.
These consolidated suits were filed by the survivors of the person killed and by three of the injured persons, seeking damages from Colt Industries, Inc., the manufacturer of the rifle, and Olin Corporation, the manufacturer of the ammunition. Also named defendants were Williams, the City of Bossier City, Fabrique Nationale Herstal, Browning Arms Corporation, and Mr. and Mrs. W.H. Hardin, owners/lessors of the lounge property.
Exceptions of no cause of action were filed by defendants Colt Industries Inc. and Olin Corporation. The exceptions were sustained by the district court and judgments were rendered dismissing plaintiffs' suits as to those defendants. Plaintiffs appealed. For reasons expressed in this opinion, we affirm the judgments of the trial court.
In considering an exception of no cause of action, a court must accept as true all of the facts, but not argumentative and conclusionary statements, alleged in the plaintiff's petition. In addition to the facts set forth in the opening paragraph of this opinion, plaintiffs allege in their petitions that the AR-15 and its ammunition were designed and marketed to the general public as an offensive assault rifle for use in killing and maiming human beings, with capabilities beyond any legitimate civilian use, and that defendants knew or should have known the weapon and its ammunition would be used to kill and maim human beings. The plaintiffs' allegations, partly factual and partly argumentative and conclusionary, are set forth in more detail in Appendix A attached to this opinion.
Plaintiffs advance four theories of recovery:
(1) the manufacturing and marketing of the AR-15 assault rifle and its ammunition to the civilian public is an ultrahazardous activity rendering defendants absolutely liable;
(2) the weapon and its ammunition are unreasonably dangerous and defective per se rendering defendants liable under strict products liability;
(3) the manufacturing and distribution of the products presented an unreasonable risk of harm, amounting to negligence and rendering defendants liable under LSA-C.C.Art. 2315; and
(4) assuming defendants had a legal right to distribute the products to the *223 public, defendants are liable because they abused that right.

I.
This case does not involve issues of "gun control." This is a civil damage suit between private parties to be decided by the court under principles of tort and product liability law. Whether the manufacture, sale, or possession of assault rifles or any other type of gun should be banned or otherwise regulated is a societal issue best decided by the legislative branch of government, the Congress or the state legislature, and not by the court. To this point in time, neither the Congress nor the Louisiana Legislature has enacted any legislation regulating the manufacture, sale, or possession of assault rifles.

II.
The primary legal issues presented by these cases were resolved adversely to the plaintiffs by this court in Strickland v. Fowler, 499 So.2d 199 (La.App. 2d Cir. 1986), writ. denied, 500 So.2d 411 (La.1986), and by the United States Fifth Circuit Court of Appeals, applying Louisiana law, in Perkins v. F.I.E. Corporation, 762 F.2d 1250 (5th Cir.1985). Those cases involved innocent victims shot by criminals using handguns. In Strickland plaintiffs' suits against the manufacturers of the guns were dismissed on exceptions of no cause of action. In Perkins the suits were dismissed by summary judgment.
Strickland and Perkins directly addressed the ultrahazardous activity and strict products liability theories advanced by plaintiffs, with the conclusion of the exhaustive and authoritative Perkins opinion being quoted with approval in Strickland as follows:
"The marketing of handguns to the general public falls far beyond the boundaries of the Louisiana doctrine of ultrahazardous activities. It is not an activity related to land or other immovables, and the injuries of which the plaintiffs complain were not caused by the marketing itself, but rather result only when there is substandard conduct on the part of third parties. Whether an activity should be classed as "ultrahazardous" is a question of law, and we hold that the plaintiffs in this case cannot recover under that theory.
The plaintiffs have not alleged that there was anything functionally wrong with the handguns causing the injuries in these cases. Because the guns functioned precisely as they were designed, and because the dangers of handguns are obvious and well-known to all members of the consuming public, we hold that the plaintiffs cannot recover, as a matter of law, under Louisiana products liability law, either under the consumer expectation test of De Battista or under the risk/utility test of Hunt.2 Id. at 1275.
2 The cases referred to are De Battista v. Argonaut-Southwest Insurance Company, 403 So.2d 26 (La.1981) and Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980)."
Strickland further concluded:
"In so determining [that plaintiffs do not state a cause of action under products liability principles], we are mindful of the Louisiana Supreme Court's recent exposition on per se unreasonably dangerous products in Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La. 1986). We find nothing in that opinion which assists the position of plaintiffs here."
The federal court in Perkins thoroughly reviewed the application of the doctrine of absolute or strict liability for ultrahazardous activity in Louisiana. In holding that the manufacture and marketing of handguns to the general public is not an ultrahazardous activity the court concluded that the doctrine of ultrahazardous activity is defined by the following boundaries: (1) the activity must be an activity relating to land or other immovables, (2) the activity itself must cause the injury and the defendant must have been engaged directly in the injury producing activity, and (3) the activity must not require the substandard conduct of a third party to cause injury.
It may be, as plaintiffs in the present case argue, that there can be liability *224 for injuries resulting from ultrahazardous or inherently dangerous activities unrelated to the use of land or other immovables. Be that as it may, it is clear that no Louisiana case has ever applied the doctrine so as to impose absolute or strict liability on a defendant where the activity did not directly cause the injury, the defendant was not engaged directly in the injury producing activity, and the activity required substandard conduct on the part of a third party to cause injury, as is the situation in the present case. The manufacture and distribution of guns is not an ultrahazardous activity, that is, one that is inherently dangerous and likely to directly cause injury regardless of how carefully the activity is conducted. In the present case it was the substandard, criminal conduct of an unrelated third party, the gunman, which caused the injuries and without which the injuries would not have occurred. See also Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982) and Bianchini v. Humble Pipe Line Company, 480 F.2d 251 (5th Cir.1973).
Strickland and Perkins likewise correctly dealt with and disposed of the contention that the manufacturer was liable under a theory of strict products liability. In general, to recover in a products liability case the plaintiff must prove that the product was defective, that is, unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect. Weber v. Fidelity and Casualty Insurance Company of New York, 250 So.2d 754 (La.1971). If the product is proved defective by reason of its hazard to normal use, plaintiff need not prove any negligence in the manufacturing of the article because the manufacturer is presumed to know the vices in the things it makes. Weber, supra. A product is considered unreasonably dangerous if the article which injured the plaintiff was dangerous to an extent beyond that which would be contemplated by an ordinary consumer. De Battista v. Argonaut-Southwest Insurance Company, 403 So.2d 26 (La.1981), cert. den., 459 U.S. 836, 103 S.Ct. 82, 74 L.Ed.2d 78 (1982). In addition to this "consumer expectation test", defectiveness is tested by the "risk/utility test" in which a balancing test is mandated; if the likelihood and gravity of harm outweigh the benefits and utility of the manufactured product, the product is "unreasonably dangerous." Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980).
Classifications of unreasonably dangerous products have been recognized by Louisiana courts: (1) A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product; (2) A product is unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be; (3) A product may be unreasonably dangerous if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user; (4) The product may be unreasonably dangerous because of its design if (a) a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product, (b) if alternative products were available to serve the same needs or desires with less risk of harm, or (c) there was a feasible way to design the product with less harmful consequences. Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La. 1986).
In a typical products liability case there exists some defect in the product or some unintended side effects or results. In the instant case the weapon functioned properly as it was designed to operate. There was nothing "wrong" with it in a functional sense. There must be "something wrong" with a product before the risk/utility analysis may be applied in determining whether the product is unreasonably dangerous or defective. See Handguns *225 and Products Liability, 97 Harv.L. Rev. 912, 915 (1984).
The unreasonably dangerous per se classification recognized in Halphen was not discussed in Perkins, which was decided before Halphen, but was acknowledged and rejected as applied to the manufacturer of a handgun by this court in Strickland. The classification of unreasonably dangerous per se was recognized in Halphen in the context of considering the liability of a manufacturer of asbestos which had an unknown dangerous side-effect. Whether a product is unreasonably dangerous per se is to be determined by applying the risk/utility test. But the risk or danger, the danger-in-fact, to be balanced with utility is a danger or risk not intended as the primary or basic function of the product. The primary or basic function of a gun is to fire a bullet capable of killing. A gun that has the capacity to shoot and kill, which is its primary function, cannot be said to be unreasonably dangerous per se because it has that capacity. A product cannot be said to be unreasonably dangerous per se where the danger complained of is the purpose and function of the product.
The decisions in the Perkins and Strickland cases are determinitive of the present case unless, as argued by plaintiffs, there is a distinction with legal effect to be drawn between the manufacture and sale of handguns and the manufacture and sale of assault rifles.
Plaintiffs argue that comparing a handgun to an assault rifle is like comparing a firecracker to dynamite. It is argued that handguns are primarily defensive weapons and assault rifles are primarily offensive weapons, and that while there may be some social utility for handguns there is none for assault rifles. Plaintiffs emphasize the greater power, penetrating capabilities, and rapid fire of the assault rifle. It is argued that the manufacture of assault rifles and the manner in which they are marketed create an atmosphere of violence and an increased risk beyond that presented by other guns, thereby rendering this product unreasonably dangerous and defective and presenting an unreasonable risk of harm to the public.
We recognize the difference in physical characteristics and capabilities of assault rifles as compared to handguns or other guns. However, all guns are dangerous and have the capacity to kill. Each type of gun has characteristics that make it more dangerous than another type, depending on the circumstances of its use. A handgun can be concealed and in that sense is more susceptible to criminal misuse than larger guns. For example, it is doubtful that John Hinckley could have approached and shot President Reagan had Hinckley been armed with an assault rifle. It is common knowledge that the number of incidents of criminal misuse of handguns and injuries inflicted on innocent victims by those guns far exceeds the misuse of and injuries inflicted by assault rifles. See "Handguns and Products Liability," supra. at page 914. Thus, attempting to characterize one type of gun as presenting a greater risk of harm or as being more susceptible of criminal misuse than another type becomes extremely tenuous.
We conclude that the legal principles applied and the results reached in Strickland and Perkins involving criminal misuse of handguns are controlling in the instant case involving a semi-automatic assault rifle. The manufacturers of the weapon and the ammunition used in it are not liable for injuries resulting from the intentional criminal misuse of the gun.
We note that in all but one of the cases from other jurisdictions cited in briefs of the parties, the courts of other states and federal courts have reached the same result, rejecting the claims for damages of victims shot by handguns against the manufacturers of those guns. See Accord: Mavilia v. Stoeger Industries, 574 F.Supp. 107 (D.Mass.1983); Martin v. Harrington & Richardson, Inc., 743 F.2d 1200 (7th Cir.1984); Patterson v. Rohm Gesellschaft, 608 F.Supp. 1206 (N.D.Tex.1985); Coulson v. DeAngelo, 493 So.2d 98 (Fla.App. 4th Dist.1986); Bennet v. Cincinnati Checker Cab Co., 353 F.Supp. 1206 (E.D.Ky.1973); Riordan v. International Armament *226 Corp., 132 Ill.App.3d 642, 87 Ill.Dec. 765, 477 N.E.2d 1293 (1985); Burkett v. Freedom Arms, 299 Or. 551, 704 P.2d 118 (1985); Richardson v. F.I.E. Corp., 741 S.W.2d 751 (Mo.App.1987). Contra: Kelley v. R.G. Industries, Inc., 304 Md. 124, 497 A.2d 1143 (1985). See also 44 ALR 4th 595, "Handgun Manufacturer's or Seller's Liability for Injuries Caused to Another by Use of Gun in Committing Crime."
Defendants contend that plaintiffs' cause of action, if any, is abrogated by the Louisiana Products Liability Act, LSA-R.S. 9:2800.51 et seq., effective September 1, 1988, which should be applied retroactively. In view of the conclusions reached above, it is not necessary for us to consider whether the act should be applied retroactively to this case which arose prior to the effective date of the act, or the effect of the act on the law applicable to this case.

III.
Plaintiffs further argue that defendants are liable under principles of negligence and general fault concepts under LSA-C.C. Art. 2315. The duty of a manufacturer of a product is defined in the products liability cases as the duty not to place in the hands of the public a defective product, that is, one that is unreasonably dangerous or presents an unreasonable risk of harm. Strict products liability of a manufacturer is an expansion of traditional fault principles in that it does not require a showing of negligence on the part of the manufacturer. Thus, if there can be no recovery under products liability principles, there can be no recovery under negligence principles. The manufacturer's duty is the same; the only difference is the requirement of showing negligence. As we have already concluded that the products involved in this case were not unreasonably dangerous and that no duty was violated by the manufacturers, there can be no recovery under a theory of negligence. There is no duty on the part of the manufacturer to refrain from manufacturing and selling guns, be it handguns or assault rifles, to those who are lawfully entitled to possess such guns.
Plaintiffs further argue that defendants should be held liable under general fault principles of LSA-C.C. Art. 2315 and that it is not necessary to place their cause of action into previously recognized categories such as ultrahazardous activity, products liability or negligence. They argue that any activity which creates an unreasonable risk of harm amounts to fault for which there should be liability.
Suffice it to say that in order to find liability for fault under the Civil Code there must be a finding of duty, breach of duty, and injury caused by the breach. All of the foregoing discussion in this opinion is in the framework of these fault concepts. The duty of the gun manufacturer and ammunition manufacturer does not extend as far as plaintiffs would urge, there was no breach of duty, and likewise no injury caused by any breach of duty on the part of the manufacturer.

IV.
Plaintiffs argue that if the defendants did have a lawful right to market the weapons and ammunition to the general public, the defendants abused that right and should be held liable for that abuse.
The "abuse of rights" doctrine has been applied only when one of the following conditions is met: (1) if the predominant motive for exercising a right was to cause harm; (2) if there was no serious or legitimate motive for exercising the right; (3) if the exercise of the right is against moral rules, good faith, or elementary fairness; (4) if the right is exercised for a purpose other than that for which it is granted. Truschinger v. Pak, 513 So.2d 1151 (La.1987); Illinois Central Gulf Railroad Co. v. International Harvester Co., 368 So.2d 1009 (La.1979).
The defendant manufacturers' motive was economic, not to cause harm to the plaintiffs. That motive was serious and legitimate. The manufacture and sale of guns has never been considered immoral. None of plaintiffs' allegations permit a conclusion that defendants' right to manufacture a legal product was exercised for any *227 purpose other than for business and economic gain.
Plaintiffs cite no cases where the abuse of rights doctrine has been applied in a tort or products liability case. The doctrine does not apply here and does not afford plaintiffs a cause of action.

V.
For the reasons assigned the judgments of the district court sustaining exceptions of no cause of action filed by defendants Colt Industries, Inc. and Olin Corporation and dismissing plaintiffs' suits as to those defendants, are affirmed at appellants' costs.
AFFIRMED.

APPENDIX A
Pertinent allegations of plaintiffs' petitions and attached exhibits are:
1. On December 31, 1986, at approximately 11:15 P.M., CODY WAYNE WILLIAMS fired 55 rounds of .223 caliber ammunition through two closed and locked steel doors at the Hub Lounge in Bossier City, Bossier Parish, Louisiana.
2. In order to accomplish that shooting, CODY WAYNE WILLIAMS used a Colt AR-15 Model SP1, bearing serial number SP194092, which weapon was manufactured and distributed by the defendant COLT INDUSTRIES, INC.
3. The 55 rounds of ammunition fired from the Colt weapon were manufactured and distributed by the defendants, OLIN CORPORATION, FABRIQUE NATIONALE HERSTAL, and BROWNING ARMS CORPORATION.
4. The 55 rounds of ammunition penetrated the two steel doors and engulfed the interior of the Hub Lounge in a barrage of deadly bullets and bullet fragments, which projectiles ultimately struck six of the occupants of the Hub Lounge.
5. The Colt AR-15 assault rifle is the civilian version of the Colt M-16, which is the standard issue military assault weapon used by the United States military forces as a primary weapon of war. The primary and/or sole difference between the Colt AR-15 and the Colt M-16 is that the Colt AR-15 is capable of only semi-automatic firing, while the Colt M-16 is capable of fully automatic firing. Aside from this distinction, the Colt AR-15 has the same killing, maiming, and assault rifle capabilities as the Colt M-16 regularly used by the United States armed forces engaged in warfare.
6. The Colt AR-15 and the Colt M-16 were designed specifically and exclusively to kill and maim human beings in wartime service.
7. To satisfy the intended wartime purpose of the Colt AR-15 and the Colt M-16, the defendant, COLT INDUSTRIES, INC. designed that weapon with the capability of penetrating steel doors and other exterior building structures with sufficient muzzle velocity to cause severe injury and/or death to the occupants of such buildings.
8. The defendants, COLT INDUSTRIES, INC., OLIN CORPORATION, FABRIQUE NATIONALE HERSTAL, and BROWNING ARMS CORPORATION, incorporated into the design of the Colt AR-15, the Colt M-16, and the ammunition used therewith, the capacity and propensity of the bullet to "tumble" on impact in order to increase the killing and maiming capability of said weapon.
9. Over the past twenty years, defendant COLT INDUSTRIES, INC. has made a deliberate and concerted effort to market and sell to the public the Colt AR-15 similar and identical to the Colt weapon used by CODY WAYNE WILLIAMS, which weapon is simply nothing less than a military assault rifle designed specifically and exclusively to kill and maim human beings in combat situations.
10. There is no legitimate civilian function or purpose for the manufacture and sale of the Colt AR-15 weapon.
11. In the event there are legitimate civilian purposes of the Colt AR-15 weapon, then that weapon has killing, maiming, and penetrating capabilities far in excess of what was necessary to satisfy those legitimate civilian purposes.
*228 12. COLT INDUSTRIES, INC. advertised and promoted the Colt AR-15 weapon as an "assault rifle" to be used for offensive purposes against human beings, and engaged in a marketing campaign designed and intended to promote and sell the Colt AR-15 weapon to extremists and other individuals likely to use such weapon to assault human beings in a "para-military" fashion.
13. COLT INDUSTRIES, INC. has engaged in a deliberate course of conduct with the specific intended purpose of selling to a civilian population a weapon with extraordinary military capabilities, when it knew, or should have known, that such weapon would be used by the civilian population to kill and maim human beings.
14. Had the Colt AR-15 weapon not had its extraordinary military capabilities, then the defendant CODY WAYNE WILLIAMS would not have been able to accomplish his assault on the Hub Lounge in such a deadly fashion and the injuries to the plaintiffs would not have occurred.
15. The ammunition used by CODY WAYNE WILLIAMS in his assault on the Hub Lounge was steel jacketed ammunition, which factor, when combined with the high velocity design of such ammunition, made that ammunition capable of penetrating the two steel doors of the Hub Lounge with deadly force.
16. The ammunition used by CODY WAYNE WILLIAMS had offensive capabilities far in excess of what were necessary to satisfy any legitimate civilian function of such ammunition.
17. COLT INDUSTRIES, INC. actively participated in, encouraged and solicited the testing documented at Page 55 of Volume V, Issue No. 1 of the magazine entitled, "Assault Firearms." Further, COLT INDUSTRIES, INC. encouraged, participated in, and solicited the publication of the results of said testing in a civilian magazine of general circulation.
18. COLT INDUSTRIES, INC. encouraged, participated in, and solicited the testing of the Colt AR-15 on ordinance gelatin, a substance designed to be, and described as, "the most accurate simulation of human flesh present-day chemistry can devise," and further encouraged, promoted, and solicited the publication of the results of said test in a magazine of general civilian distribution.
19. The two publications attached to plaintiffs' First Supplemental and Amending Petition are isolated examples of an ongoing marketing campaign by COLT INDUSTRIES, INC., which marketing campaign deliberately suggests that the Colt AR-15 weapon can and should be used to kill human beings.
20. When a Colt AR-15 was fired at 200 yards distance into 14 layers of ¾-inch white pine (a total of 10-½ inches of white pine lumber), the bullet went completely through the 10-½ inches of lumber "without so much as a hint of slowing down," which led Colt's test representative to state that such a result "does indeed constitute a valuable lesson for anyone who regards a treeany treeas `cover'...."
21. When a Colt AR-15 was fired from 100 yards into 14 layers of ¾ inch white pine with sheets of 1/16-inch steel plate between each such pine board, the bullet from the AR-15 went completely through the first three boards and the first two layers of 1/16-inch steel plate and deeply penetrated the third layer of 1/16 inch steel plate.
22. In testing the "terminal effect" of a round fired from the Colt AR-15, Colt's representative fired from 100 yards at a 9-inch thick block of ordinance gelatin which he described as "the most accurate simulation of human flesh present-day chemistry can devise," and observed that the bullet "did indeed reveal a tendency to go unstable only an inch or so from point of impact" and that "manifest tumbling behavior occurred, and fissures up to one and three quarter inches long were observed to radiate outward from the central wound channel; a `trauma channel' up to three and one-quarter inches wide in some places was thus formed."
23. Colt's representative concluded that a round fired from the Colt AR-15 at 100 yards caused trauma "many times more *229 extensive" than a 45 caliber military load causes at arms-length distance.