12 A.3d 84

POTOMAC VALLEY ORTHOPAEDIC ASSOCIATES, et al.

v.

MARYLAND STATE BOARD OF PHYSICIANS, et al.

No. 18, Sept. Term, 2008.

Court of Appeals of Maryland.

Jan. 24, 2011.

Howard R. Rubin (William E. Copley of Sonnenschein Nath & Rosenthal LLP, Washington, D.C.), on brief, for appellants.

Thomas W. Keech, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for appellees.

Gary R. Alexander (James K. McGee of Alexander & Cleaver, P.A., Fort Washington, MD), on brief, for appellees.

William J. Murphy, Esq., John J. Connolly, Esq., Murphy & Shaffer LLC, Baltimore, MD, for Amici Curiae brief of the American Association of Orthopedic Surgeons, American College of Surgeons, American Urological Association, American Association of Neurological Surgeons, American Academy of Neurology, and American Gastroenterological Association.

Seth A. Rosenthal, Esq., Kristin M. Koger, Esq., Venable LLP, Rockville, MD, for Amicus Curiae brief of the American College of Radiology.

Shari Ross Lahlou, Esq., Crowell & Morning LLP, Washington, D.C., for Amicus Curiae brief of the American Society for Therapeutic Radiology and Oncology.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

MURPHY, J.

This case presents an issue of statutory interpretation that arises out of a "DECLARATORY RULING" requested pursuant to Section 10–304(a) of the State Government Article (SG), and issued on December 20, 2006 by the Maryland State Board of Physicians (the Board) pursuant to SG § 10–305(a). After that ruling was affirmed by the Circuit Court for Montgomery County pursuant to SG § 10–305(c), the Appellants—twelve medical practices that specialize in the fields of

orthopedics, urology, radiation oncology and emergency medicine—noted an appeal to the Court of Special Appeals pursuant to SG § 10–223(b)(1), and presented that Court with the question of "[w]hether the Maryland Patient Referral Law [ (Subtitle 3 of Title 1 of the Health Occupations Article) ] prohibits an orthopaedic surgeon from furnishing patients with MRI or CT diagnostic services within his or her office or group, even when the orthopaedist complies with the 'group practice' exemption in Health Occ. § 1–302(d)(2) or the 'direct supervision' exemption in Health Occ. § 1–302(d)(3)?" Before the Appellees filed their briefs in the Court of Special Appeals,[1] this Court issued a writ of certiorari on its own initiative. 404 Md. 659, 948 A.2d 70 (2008).

Although the Appellees agree that this case presents but one question, they argue that the question should be rephrased. According to Mark Bohlman, M.D. (who is participating as an Appellee "Individually and as President on behalf of The Maryland Radiological Society, Inc."), the proper question is:

Whether or not the Board Erred in Ruling that a Referral by an Orthopaedic Physician for an MRI to be Performed on or by an MRI Machine Owned or Leased by the Orthopaedic Practice is an Illegal Self–Referral within the Meaning of the Maryland Self referral Law and was not Exempt under the Exemptions set out in § 1–302(d)(2), (3) or (4) of the Health Occupations Article of the Maryland Annotated Code[?]

According to the Board, the proper question is:

Do the three exceptions in HO § 1–302(d)(2), (3) and (4) to the general statutory prohibition against physician self-referrals apply to a physician's referral of a patient for MRI imaging on a machine in which that physician's practice has a beneficial financial interest?

---

**1.** Because no prior appellate decision has been rendered in the case at bar, the designation of the parties is controlled by Maryland Rule 8–111(a)(1).

For the reasons that follow, we hold that the Board's Declaratory Ruling was correct, and therefore affirm the judgment of the Circuit Court.

## Background

The Board's Declaratory Ruling included the following findings and conclusions:

### INTRODUCTION

This Declaratory Ruling arises out of two formal petitions, separately filed by CareFirst BlueCross BlueShield and The Injured Workers' Insurance Fund. These petitions ask the Board for a ruling on the propriety under the Maryland Self Referral Law of referrals made by physicians for MRI scans when that physician has a financial interest in the performance of that scan.

\* \* \*

### BACKGROUND

\* \* \*

[T]he cases reviewed by the Board ... indicate that a common factual scenario exists among some Maryland orthopaedic practice groups with respect to referrals for MRI services. The common factual scenario is set out below. Additionally, the Board has found several relevant variations to the general fact pattern that occur frequently in Maryland. The Board will rule on those as well.

#### General Fact Pattern

A patient is seen by an orthopaedic physician who has a beneficial financial interest in the orthopaedic practice. The patient may have been referred to the orthopedist by another physician, or the patient may have come directly to the orthopaedic physician. The orthopaedic physician makes a referral for an MRI scan. The patient receives the MRI a few days or weeks later on an MRI machine that is owned and operated by, or leased by, the orthopaedic physician's practice. The MRI image may be read in-house or may be sent to an off-site radiologist to read.

An off-site radiologist may state his or her findings in a radiology report and forward the report back to the orthopaedic physician. The referring orthopaedic physician's practice submits a bill for the MRI as the provider of the MRI scan (though not necessarily as the provider of the interpretation of the scan).

Additionally, the Board found the following variations to this fact pattern. The following are modified fact patterns which may also occur in significant numbers in this State.

## VARIATION 1

Same as the general fact pattern, but the orthopaedic physician obtains a signed Maryland Uniform Consultation Referral Form from the patient's primary care physician after the orthopedic physician determined that the MRI was necessary, but before the MRI was actually conducted.

The primary care physician does not, between the time that the orthopaedic physician determines that the MRI is necessary and the time that the MRI was accomplished, see the patient for the purpose of determining if the MRI is necessary, nor does he or she exercise independent medical judgment as to whether the MRI is appropriate or necessary.

## VARIATION 2

Same as the general fact pattern, but the orthopaedic physician names the primary care physician as the "referring physician" in the Health Insurance Claim Form.

The primary care physician does not, between the time that the orthopaedic physician determines that the MRI is necessary and the time that the MRI was accomplished, see the patient for the purpose of determining if the MRI is necessary, nor does he or she exercise independent medical judgment as to whether the MRI is appropriate or necessary.

## VARIATION 3

Same as the general fact pattern, but a physician who is an employee of the medical practice that provides the MRI scan evaluates the patient and orders the MRI to be done by that practice. The physician-employee does not have any beneficial interest in the medical practice.

## ANALYSIS

### The Purpose of the Self–Referral Law

The Maryland Self–Referral Law was enacted during the 1993 legislative session as House Bill 1280 (HB 1280). The Legislative history shows that HB 1280 was part of a statutory scheme designed to address two problems plaguing health care in Maryland: "access to health insurance and escalating health care costs."

\* \* \*

There seems to be little question that the legislature intended by this bill to substantially restrict the practice of self-referring, especially self-referrals of MRI scans, CAT scans and radiation therapy services. The Self–Referral Law thus created a broad and pervasive prohibition against self-referrals not only by physicians (as did the federal law) but also all by all other health care providers. In addition, and again unlike the federal law, the Maryland prohibition covered every type of health care service.

The Maryland–Self Referral Law first flatly bans any self-referral and any arrangement or scheme which has a principal purpose of accomplishing self-referrals:

(a) *Prohibited referrals.*—Except as provided in subsection (d) of this section, a health care practitioner may not refer a patient, or direct an employee of or a person under contract with the health care practitioner, to refer a patient to a health care entity:

(1) [I]n which the health care practitioner or the practitioner in combination with the practitioner's immediate family owns a beneficial interest.

(2) In which the practitioner's immediate family owns a beneficial interest of 3 percent or greater; or

(3) With which the health care practitioner, the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a compensation arrangement....

(b) *Payment prohibited.*—A health care entity or a referring health care practitioner may not present or cause to be presented to any individual, third party payor, or other person a claim, bill or other demand for payment for health care services provided as a result of a referral prohibited by this subtitle.

(c) *Applicability of subsection(a).*—Subsection (a) of this section applies to any arrangement or scheme, including a cross-referral arrangement, which the health care practitioner knows or should know has a principal purpose of assuring indirect referrals that would have [been] in violation of subsection (a) of this section if made indirectly.

Md. Health Occ.Code Ann. § 1–302 (cited hereafter by section "§" only.)

Because the general rule is so broad and sweeping, numerous exceptions had to be made to accommodate situations in which there is no significant threat of overutilization. Each of the three exceptions at issue in this case generally permits referrals where there is little incentive for a physician to self-refer for financial gain.

This Declaratory Ruling will deal with the three exceptions contained in § 1–302(d)(2), (d)(3) and (d)(4), as they apply to the fact patterns developed in this case. In interpreting these exceptions, the Board has complied with the following statutory construction rules. The statute should be interpreted "with reference to the purpose to be accomplished." *State v. Fabritz,* 276 Md. 416, 421[,

348 A.2d 275, 278] (1975). The statute must be considered "in its entirety, in the context of the purpose underlying its enactment." *Id.* The interpretation must seek to harmonize the statute as a whole. *In re Steven [Stephen]* *K.,* 289 Md. 294, 298[, 424 A.2d 153, 155] (1975[1981]). Language of an individual part of a statute must be interpreted "in relation to all its provisions," and the interpretation must "harmonize individual selections as parts of a whole." *Burghout [Barghout]* *v. Mayor and City Council of Baltimore,* 325 Md. 311, 317[, 600 A.2d 841, 844] (1992). The statute must be interpreted "as a whole[ ] so that no word, clause[, sentence,] or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Lawson v. State,* 389 Md. 570, 583[, 886 A.2d 876, 883] (2005).

Although, as the parties argue, the statute is "extraordinarily complex," this does not in the Board's opinion relieve the Board of its responsibility to interpret it. The statute should be interpreted consistently with its overall purpose, taking into account all parts of the statute and without rendering any particular part of the statute meaningless or superfluous.

\* \* \*

1. Exception § 1–302(d)(2)

 (d) The provisions of this section do not apply to:

 (2) A health care practitioner who refers a patient to another health care practitioner in the same group practice as the referring health care practitioner.

§ 1–301(d)(2).

The Board finds that the exception contained in (d)(2) was intended to create an exception for referrals that transfer *a patient,* permanently or temporarily, from one health care practitioner in a group practice to another.

If this exception did not exist, the Self Referral Law would prohibit a physician from referring a patient to another member of the group practice in any situation,

even when a physician is simply going out of town and refers a patient temporarily to his or her partner....

\* \* \*

.... The Board concludes that exception (d)(2) simply allows the transfer of the professional responsibility for the patient's continued care, including professional decision-making about the course of that care, to another physician within the same group practice. Exception (d)(2) thus does not exempt referrals for specific "services or tests" already chosen by the referring physician.

Some of the parties have argued that, because the term "referral" is defined broadly in § 1–301(1), the term "refers a patient" in (d)(2) must also be defined that broadly. The Board disagrees.... Since the words "services or tests" are not used in (d)(2), the Board concludes that (d)(2) was not intended to apply to services or tests that the referring physician has already determined are necessary.

\* \* \*

**.... The only way to read (d)(2) and (d)(4)(i)(2) together so that they both have meaning is to read (d)(2) to apply to the referral to a physician in the same group practice of a *patient,* but not for "services" or "tests" already determined necessary by the referring physician. This interpretation thus harmonizes these exceptions and at the same time is in accordance with the overall purpose of the Self referral Law to prevent self-referrals in situations where the opportunity for financial gain from referrals brings about a risk of overutilization."**

\* \* \*

.... A referral for MRI scan is a referral for a service or test, not a referral of a "patient" within the meaning of (d)(2). MRI scans are thus not covered at all by exception (d)(2), because that exception deals with referrals of a patient and not with referrals for "services or tests." **The referrals for MRI scans made by the physicians in**

this case, to the extent that they result in an MRI scan in which the referring physician has a beneficial interest, are not exempted from the Maryland Self Referral Law by exception (d)(2).

2. Exception § 1–302(d)(3)

(d) The provisions of this section do not apply to:

(3) A health care practitioner with a beneficial interest in a health care entity who refers a patient to that health care entity for health care services or tests, if the services or tests are personally performed by or under the direct supervision of the referring health care practitioner.

§ 1–302(d)(3).

The Board finds that the exception contained in § 1–302(d)(3) was intended to create an exemption for referrals of a patient for services or tests to a health care entity that is outside of the referring physician's practice, even if the referring physician holds a beneficial interest in the outside entity, **so long as the physician is personally present within the treatment area when the service is performed and either personally providing the service or directly supervising that service.**

\* \* \*

Exception (d)(3) appears to parallel the AMA policy that the legislature intended to implement. First, the AMA policy applies only where the physician has an investment interest; likewise (d)(3) only applies where the physician has a beneficial interest. Second, the AMA policy requires the physician to "directly render services" at the outside entity; likewise, (d)(3) requires the physician to personally perform or directly supervise the service or test while present at the entity." Exception (d)(3) was intended to parallel the AMA policy; it therefore creates an exception that permits a physician in certain circumstances to refer patients to an <u>outside</u> entity in which he or she holds a beneficial interest. Exception (d)(3) does not, however,

permit a physician to refer to his or her own in-office practice.

**MRIs are "service or tests." Exception (d)(3), however, applies only to referrals for services or tests to outside entities and not to in-office referrals within the group practice of the referring practitioner. Exception (d)(3) thus does not apply to in-office referrals by physicians for MRI scans to be provided by their own practices.**

 3. <u>Exception (d)(4)</u>

(d) The provisions of this section do not apply to:

(4) A health care practitioner who refers in-office ancillary services or tests that are:

(i) Personally furnished by:

(1) The referring health care practitioner;

(2) A health care practitioner in the same group practice as the referring health care practitioner; or

(3) An individual who is employed and personally supervised by the qualified referring health care practitioner or a health care practitioner in the same group practice as the referring health care practitioner;

(ii) Provided in the same building where the referring health care practitioner or a health care practitioner in the same group practice as the referring health care practitioner furnishes services; and

(iii) Billed by:

(1) The health care practitioner performing or supervising the services; or

(2) A group practice of which the health care practitioner performing or supervising the services is a member.

§ 1–302(d)(4).

(1) "In-office ancillary services" means those basic health care services and tests routinely performed in the office of one or more health care practitioners. (2) Except for a

radiologist group practice or an office consisting solely of one or more radiologists, "in-office ancillary services does not include: (i) Magnetic resonance imaging services; (ii) Radiation therapy services; or (iii) Computer tomography scan services.

H.O. § 1-301(k)

**Significantly for this case, exception (d)(4) by definition does not include MRI, CAT scan, or radiation therapy services.** Thus, no detailed analysis of (d)(4) is needed except possibly to shed light on the meaning of all three of the exceptions when read together. **The first and most obvious consideration is that the legislature's clear language excluding self-referred MRIs from being exempted under (d)(4) makes it highly improbable that the legislature simultaneously intended to permit the same self-referred MRIs under (d)(2) or (d)(3). In this statutory context, an overly broad reading of (d)(2) or (d)(3) so as to make them overrule (d)(4) would make no common sense.** The second consideration is that (d)(4) appears to round out the legislature's scheme of three discrete but meaningful exceptions.

Unlike (d)(2), which does not deal with "services or tests" at all, and (d)(3), which deals with "services or tests" referred to <u>outside</u> entities, the exception in (d)(4) was intended to create an exception for referrals for "services or tests" <u>within</u> the referring practitioner's practice. The Board finds that "in-office" means within the practice. Exception (d)(4) is thus the only exception for referrals for "services or tests" <u>within</u> the referring physician's practice. **If a referral is for a "service" or "test" and is made in-office, it must meet the requirements of (d)(4). This result follows logically from the discussion above, in which the Board analyzed exceptions (d)(2) and (d)(3) and found that neither of them dealt with "services" or "tests" performed in-office. The three provisions apply to discrete situations and provide limited but meaningful exceptions without contradicting each other or violating the legislative intent.**

Exceptions (d)(2), (d)(3) and (d)(4):

Summary of Findings

The Board concludes that § 1–302(d)(2), (d)(3) and (d)(4) were intended to apply in separate and distinct factual scenarios. Exception (d)(2) was intended to cover referrals "of a patient" within a group practice. Exception (d)(3) was intended to cover referrals for "services or tests" to an entity that is outside of the referring physician's practice. Exception (d)(4) was intended to cover referrals made for "services and tests" that are basic, "routine" and rendered within the referring physician's practice, but not including MRIs. Read together, these exceptions are narrow and meaningful, do not overlap or contradict each other, and are consistent with the legislature's intent of permitting exceptions only when the danger of overutilization is small. This conclusion is the same as that reached by the Attorney General. *See* 89 Op. Att'y Gen. 10 (2004) (referrals for MRIs to be performed on machines owned or leased by the referring practitioner's practice violate the Self Referral Law) and 91. Op. Att'y Gen. 49 (2006) (exception (d)(3) does not apply to in-office referrals).

*Injured Workers' Insurance Fund, et al. v. Potomac Valley Orthopaedic Associates,* Declaratory Ruling No. 2006–1, filed December 20, 2006. (Underlined and italicized words in original; emphasis otherwise supplied; footnotes omitted).

## Standard of Review

 The Declaratory Ruling of a State Administrative Agency is subject to judicial review in the same manner as provided for a "contested case" decided under the Administrative Procedure Act. SG §§ 10–305(c) and 10–223(b)(1). As the ruling at issue does not involve any disputes of fact, our role is "limited to determining ... if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel Serv., Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994). When the issue is

whether an administrative agency has made an erroneous conclusion of law, the "agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts," *Marzullo v. Kahl,* 366 Md. 158, 172, 783 A.2d 169, 177 (2001). As this Court stated in *Grasslands Plantation, Inc. v. Frizz–King Enterprises, LLC.,* 410 Md. 191, 978 A.2d 622 (2009):

> Our obligation is "to 'review the agency's decision in the light most favorable to the agency,' since their decisions are *prima facie* correct and carry with them the presumption of validity." *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 569, 709 A.2d 749, 753 (1998) (citation omitted).
>
> "Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376, 381 (1999). We are under no constraint, however, "to affirm an agency decision premised solely upon an erroneous conclusion of law." *Ins. Comm'r v. Engelman,* 345 Md. 402, 411, 692 A.2d 474, 479 (1997).

*Id.* at 204, 978 A.2d at 629.

## Discussion

According to Appellants, because the "group practice" exception is applicable to an orthopedic surgeon's referral of his or her patient to another physician in the practice for "tests or services," an orthopedic surgeon is not prohibited from making such a referral for a MRI or CT scan. Appellants also argue that the Board erred in concluding that the "direct supervision" exemption is only applicable when the referring physician has (1) referred the patient to an "outside" health care entity, and (2) "is personally present within the treatment area when the service is performed and either personally providing the service or directly supervising that service." These arguments require that we yet again "go hunting the

ghost of legislative intent." *Franklin Square Hospital v. Laubach,* 318 Md. 615, 619, 569 A.2d 693, 695 (1990). As we do so, we are aided by two Opinions of the Attorney General, as well as by an extensive legislative history, which includes significant "legislative inaction" by the General Assembly.

In *Chesek v. Jones,* 406 Md. 446, 959 A.2d 795 (2008), this Court stated:

> We have said that courts are not bound by an Attorney General's Opinion, but that "when the meaning of legislative language is not entirely clear, such legal interpretation should be given great consideration in determining the legislative intention." *State v. Crescent Cities Jaycees,* 330 Md. 460, 470, 624 A.2d 955, 960 (1993); *see also Drug & Chem. Co. v. Claypoole,* 165 Md. 250, 257, 166 A. 742, 745 (1933). The Legislature is presumed to be aware of the Attorney General's statutory interpretation and, in the absence of enacting any change to the statutory language, to acquiesce in the Attorney General's construction. *See Claypoole, supra,* 165 Md. at 257–58, 166 A. at 742.

*Id.* at 463, 959 A.2d at 805.

The Attorney General has concluded that there is no merit in either of Appellants' arguments. In 2004, while opining that "the [Maryland Self–Referral Law] bars a physician in the orthopedic practice from referring patients for tests on an MRI machine or CT scanner owned by that practice, regardless of whether the services are performed by a radiologist employee or member of the practice or by an independent radiology group," the Attorney General stated:

> "Nor would [an orthopedic surgeon's referral of his or her patient to another physician in the practice for an MRI or CT scan] fall within the exception in § 1–302(d)(2) for referrals within a group practice. Such an interpretation would render meaningless the precise limitations that the Legislature created in § 1–302(d)(4), which would encompass certain referrals within a group practice, and thus

would offend elementary principles of statutory construction."

89 Op. Att'y Gen. 10, 17 n. 8 (Jan. 2004).

Two years later, in 91 Op. Att'y Gen. 49 (Jan. 2006), while reaffirming the 2004 Opinion, the Attorney General stated:

The [2004] opinion concluded that the referral could not fall within the exception for referral for in-office ancillary services where the definition of that term specifically excludes MRI and CT scan services.... The [2004] opinion further concluded that the referral could not fall within the exception for referrals within the same group practice, as such a construction would "render meaningless the precise limitations that the Legislature created in § 1–302(d)(4), which encompasses certain referrals within group practices, and this would offend elementary principles of statutory construction" 89 *Opinions of the Attorney General* 10, 17, n. 8 (2004).

\*　　\*　　\*

It is a well-established rule of statutory construction that a statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory.... Moreover, statutes are to be interpreted in accord with logic and common sense.... If the intention of Health Occupations § 1–302(d)(3) were to permit referral to an MRI or CT scanner, or any other service performed within the office or group practice of the referring practitioner, the careful definition of "group practice" in § 1–301(f), which limits the extent of the § 1–302(d)(2) exception for referrals within a group practice, and the "precise limitations" on the ability to refer for in-office ancillary services in § 1–302(d)(4) would be rendered meaningless. The specific language removing MRI machines and CT scanners from the scope of in-office ancillary services would have no effect so long as the physician directly supervised the provisions of the services.

Rather than read the statute in such a way as to render § 1–302(d)(2) and (4) virtually meaningless, it is my view that § 1–302(d)(3) must be limited to instances where the

referral is to an entity outside the practice of the referring practitioner. Support for this reading is found not only in the AMA Policy Statement discussed above, but also in the fact that the exception applies only where the practitioner has a beneficial interest in the health care entity, and not where there is a compensation arrangement.

*Id.* at 50–53 (citations and footnotes omitted).

The legislative history of H.B. 1280 includes (1) the House Environmental Matters Committee Floor Report, and (2) the testimony presented by Del. Ronald A. Guns, Sponsor of H.B. 1280, to the Senate Economic & Environmental Affairs Committee. It is clear from that history that the General Assembly intended to exclude MRI and CT scans from the "in-office ancillary services" exemption. HO § 1–301(k)(2) expressly provides:

Except for a radiologist group practice or an office consisting solely of one or more radiologists, "in-office ancillary services" does not include:

(i) Magnetic resonance imaging services;

(ii) Radiation therapy services; or

(iii) Computer tomography scan services.

■■ From our review of the record, we hold that the Board was correct in ruling that (1) the "group practice" exemption does not permit an orthopedic surgeon to refer his or her patient for a MRI or CT scan to be performed by another member of the orthopedic surgeon's practice group, and (2) the "direct supervision" exemption, which is limited to referrals to "outside" entities, requires that the referring physician be "personally present within the treatment area when the service is performed and either personally providing the service or directly supervising that service." As the Board and the Attorney General have pointed out, a contrary conclusion would offend several well established principles of statutory construction.

Our conclusion is confirmed by the fact that, in 2007, 2008, 2009, and 2010, the General Assembly "rejected efforts to achieve legislatively that which we [are being] asked to grant

judicially." *Boblitz v. Boblitz,* 296 Md. 242, 274, 462 A.2d 506, 521 (1983). In *Moore v. State,* 388 Md. 623, 882 A.2d 256 (2005), this Court stated:

Although the failure of a single bill in the General Assembly may be due to many reasons, and thus is not always a good indication of the Legislature's intent, under some circumstances the failure to enact legislation is persuasive evidence of legislative intent. *See, e.g., Lee v. Cline,* 384 Md. 245, 255–256, 863 A.2d 297, 303–304 (2004); *Arundel Corp. v. Marie,* 383 Md. 489, 504, 860 A.2d 886, 895 (2004) ("The Legislature [has] declined invitations to modify the rule as [appellant] wishes"); *Stearman v. State Farm,* 381 Md. 436, 455, 849 A.2d 539, 550–551 (2004) ("The refusal of the Legislature to act to change a [statute] ... provides ... support for the Court to exercise restraint and refuse to step in and make the change"); *In re Anthony R., supra,* 362 Md. at 65–67, 763 A.2d at 144–145 (2000); *State v. Sowell,* 353 Md. 713, 723–724, 728 A.2d 712, 717–718 (1999) ("We have recognized that the General Assembly's failure to amend ... sometimes reflects its desired public policy"); *State v. Bell,* 351 Md. 709, 723, 720 A.2d 311, 318 (1998) ("Therefore, by declining to adopt the proposed language of the amending bill, the Legislature clearly did not intend" to adopt the result being urged); *State v. Frazier,* 298 Md. 422, 459, 470 A.2d 1269, 1288 (1984) ("All of these proposals [supporting different views of a statute advocated by the parties] were rejected by the General Assembly").

Legislative inaction is very significant where bills have repeatedly been introduced in the General Assembly to accomplish a particular result, and where the General Assembly has persistently refused to enact such bills. *See, e.g., Arundel Corp. v. Marie, supra,* 383 Md. at 502–504, 860 A.2d at 894–896; *Stearman v. State Farm, supra,* 381 Md. at 455, 849 A.2d at 551 ("Every year since 2000, legislators have introduced bills in the General Assembly that would" accomplish what the appellant urges, but "[n]one of these bills were enacted"); *Bozman v. Bozman,* 376 Md. 461, 492, 830 A.2d 450, 469 (2003), quoting *Boblitz v. Boblitz,* 296 Md.

242, 274, 462 A.2d 506, 521 (1983) (The Court will decline to adopt a particular position " 'where the Legislature repeatedly had rejected efforts to achieve legislatively that which we were asked to grant judicially' "); *Halliday v. Sturm*, 368 Md. 186, 209, 792 A.2d 1145, 1159 (2002) (The Court refused to adopt positions "that have been presented on several occasions to the General Assembly" and "[s]o far, the Legislature has chosen not" to adopt them); *Harrison v. Mont. Bd. of Educ.*, 295 Md. 442, 462, 456 A.2d 894, 904 (1983) ("It is thus important in the present case to note that in the period from 1966 through 1982, the General Assembly considered a total of twenty-one bills seeking [to adopt the appellant's position].... None of these bills was enacted. Although not conclusive, the legislature's action in rejecting the proposed change is indicative of [its] intention"); *Kline v. Ansell*, 287 Md. 585, 590, 414 A.2d 929, 932 (1980); *Demory Brothers v. Bd. of Public Works*, 273 Md. 320, 326, 329 A.2d 674, 677 (1974). As pointed out in the above-cited cases, the General Assembly's repeated refusal to enact bills, which would have adopted a party's particular view of the law, is strong evidence of legislative intent.

*Id.* at 641–42, 882 A.2d at 266–67.

In 2007, the General Assembly did not adopt House Bill 849, which was introduced for the purpose of amending the Self–Referral law to permit "multi-specialty group practice located in rural area[s]" to perform MRI and CT scans under the "in-office ancillary services" exception.[2] In 2008, the General Assembly did not adopt Senate Bill 708, which was introduced for the purpose of "altering the definition of 'in-office ancillary services' as it relates to certain referrals by certain health care practitioners so as to include magnetic resonance imaging services ... and computed tomography scan services[.]" S.B. 708, 425th Gen. Assem., Reg. Sess. (Md.2008).

---

**2.** The Health and Government Operations committee held a hearing on this bill, but no further action was taken. H.B. 849, 424th Gen. Assem., Reg. Sess. (Md.2007).

S.B. 708 proposed several changes to the Self–Referral law. "In-office ancillary services" would have expressly included:

"(i) Magnetic resonance imaging services,

(ii) Radiation therapy services, or Computer tomography scan services, if the health care entity furnishing the services meets the accreditation requirements set forth in Title 1, Subtitle 6 of this article;" and ... the "services are provided in compliance with § 1–302(d)(4)(i)4 and (ii)2 of this subtitle."

The prohibition against self-referrals would no longer have been applicable to magnetic resonance imaging services, radiation therapy services, and computer tomography scan services "personally furnished by an individual who is employed and personally supervised by the qualified referring health care practitioner or a health care practitioner in the same group practice as the referring health care practitioner ... during the regular office hours maintained by the qualified referring health care practitioner or a health care practitioner in the same group practice as the referring health care practitioner." "Personally supervised" would have been defined as "the responsibility of a health care practitioner to exercise on-site supervision or immediately available direction for employees performing in-office ancillary services or tests as a result of a referral to the health care practitioner."

The Education Health and Environmental Affairs committee held a hearing on S.B. 708, but no further action was taken.[3] In 2009,[4] and again in 2010,[5] the General Assembly did not adopt bills introduced to accomplish what the adoption of S.B. 708 would have accomplished. Under these circumstances, the General Assembly's persistent inaction is very significant evidence of its intent.

---

**3.** S.B. 708, 425th Gen. Assem., Reg. Sess. (Md.2008).

**4.** H.B. 673, 426th Gen. Assem., Reg. Sess. (Md.2009).

**5.** H.B. 324, 427th Gen. Assem., Reg. Sess. (Md.2010).

Having given appropriate consideration to the Board's interpretation and application of the statute that it administers, the opinions of the Attorney General, and the very persuasive evidence of legislative intent, we hold that the Board's Declaratory Ruling was not premised upon an erroneous conclusion of law. We therefore affirm the judgment of the Circuit Court.

**JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.**

