■ZINTER, Justice.
[¶ 1.] Richard and Susan Karst sued Shur Company and Wilson Trailer Company on negligence arid strict-liability causes of action.[1] Karsts alleged defective design and improper warnings relating to Shur’s electric-tarp system that Wilson included on a grain trailer it sold to Richard. The circuit court granted summary judgment against Karsts on their failure-to-warri claims, and a jury found in favor of Defendants on Karsts’ remairiing claims. On appeal Karsts argue that the circuit court erred in instructing the jury, in granting summary judgment on the improper-warm ing claims, in permitting an assumption-of-risk ‘ defense to go to the jury, and in refusing to admit evidence of the warnings that were provided. We affirm.

Facts and Procedural History

[¶-2,] Richard Karst was in the business of trucking and- buying and selling oats. He used a type of grain trailer that required a tarp to cover the cargo area. From 1980 until 2007, Richard used a manual-tarp system on his trailers.
[¶ 3.] In 2007, Richard purchased two new grain trailers from Wilson. Both were equipped with Shur’s model 3500 electric-tarp system. The tarp system featured a “roll tube” that ran the length of the trailer. A tarp, when rolled around the roll tube, retracted to uncover the cargo area. The roll tube was attached to the front and rear of the trailer 'by a “flex arm” at each end. The tarp system used *608 an electric motor to roll up the tarp, and the tarp was unrolled tc cover the trailer with the assistance of torsion springs located where the flex arms attached to the trailer. A spline at the rear end of the roll tube allowed the use of a manual crank to roll and unroll the tarp when necessary. However, a metal sleeve located at the end of the rear flex arm fit over the spline and connected the flex arm to the roll tube. Consequently, to , get access to the spline to unroll the tarp manually, the flex arm had to be disconnected from the roll tube by removing the sleeve.
[¶4.] On December 15, 2009, Richard loaded two trailers with oats at an elevator in McLaughlin. The lead trailer’s ,tarp closed properly, but the pup trailer’s electric-tarp system failed, leaving the roll tube and taip in the open position. A warning label located on the rear flex arm warned that it was under spring tension and advised reading the manual before disassembling the flex arm. Although the manual similarly warned that the flex arms were under tension, the manual did not offer guidance on how to unroll a tarp stuck in the open position with the electric-tarp system engaged.
[¶ 5.] Because the tarp had to be closed before leaving the elevator, Richard climbed onto a platform on the back of the trailer to attempt to manually unroll the tarp. He attempted to hold the flex arm with one hand while using a hammer to knock the flex arm’s metal sleeve off the roll tube to get access to the spline. As soon as the sleeve separated from the roll tube, the torsion springs caused the flex arm to spring toward Richard, knocking him to the ground. Richard suffered a fractured skull and permanent brain damage. As a result of the brain injury, he is unable to recall the accident.
[¶ 6.] Karsts later brought this suit on causes of action alleging strict liability and negligence (both for defectively designing the product and for failing to properly warn of the danger). Wilson moved for summary judgment on all claims, and Shur moved for summary judgment on the failure-to-wam claims. After Karsts responded to the summary judgment motions on the failure-to-warn claims, the circuit court determined that Karsts failed to produce evidence that Richard had read the provided warnings prior to the accident. The court concluded that in the absence of such evidence, Karsts would be unable to prove causation on their failure-to-warn claims. Consequently, the court granted summary judgment to Defendants on all failure-to-warn claims. The court also granted summary judgment to Wilson on Karsts’ negligent-defective-design claim.[2] After a twelve-day trial, a jury returned a verdict in favor of Defendants on Karsts’ surviving claims. •
[II7.] Karsts appeal, raising four ^issues [3]:
1. Whether Jury Instruction 20 on strict liability misstated South Dakota law and misled and confused the jury.
2. Whether the circuit court erred in granting summary judgment in favor of Defendants on Karsts’ failure-to-warn claims.
3. Whether, there, was sufficient evidence to instruct the jury on, assumption of the risk.
*609 4. Whether Karsts should have been allowed to present evidence of the warnings actually given in order to counter testimony on assumption of the risk.

Decision

Jury Instruction 20 — Strict Liability
[¶ 8.] “A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court’s decision to grant or deny a .particular instruction under the abuse of discretion standard. However, no court has discretion to give incorrect, misleading, conflicting, or confusing, instructions .,.. ” Vetter v. Cam Wal Elec. Coop., Inc., 2006 S.D. 21, ¶ 10, 711 N.W.2d 612, 615 (citations omitted). Therefore, “when the question is whether a jury was properly instructed overall, that issue becomes a question of law reviewable de novo.” Id.
[¶ 9.] Karsts argue that Instruction 20 on strict liability misstated the law and confused and misled the jury in describing products that are in a “defective condition unreasonably dangerous” to the user. Because jury instructions “must be considered as a whole in determining if error was committed in giving or refusing to give certain instructions[,]” Degen v. Bayman, 90 S.D. 400, 406, 241 N.W.2d 703, 706 (1976), Karsts’ argument requires consideration of Instructions 19 and 20 together. This case was submitted to the jury on a defective-design theory, and the parties agreed that the strict-liability question should be determined under what is commonly referred to as the risk-utility test. Accordingly, the court gave Instruction 19, which stated: “A product is in a defective condition unreasonably dangerous to the user if it could have been designed to prevent a foreseeable harm without significantly hindering its function or increasing its price.” Instruction 20 stated:
A product can be dangerous without being unreasonably dangerous. Even if a product is defective in some manner, you must find that the defect renders the product “unreasonably” dangerous. A product is hot in a defective or unreasonably dangerous condition merely because it is possible to be injured while using it.
According to Karsts, Instruction 20 was not needed because “Instruction 19 gave the jury all of the law it needed to decide whether defendants were liable on a product-defect theory.” Karsts more specifically contend: (1) that under South Dakota law, Instruction 20 incorrectly implied a separate unreasonably-dangerous test, that defectiveness and unreasonable dangerousness are not separate elements, and that the jury was not required to accept any level of danger in this product; (2) Instruction 20 derives from Restatement (Second) of Torts § 402A comment k (Am. Law Inst.1965), which applies only to products that are unavoidably unsafe; (3) Instruction 20 gave no standard'for differentiating between a dangerous product and an unreasonably dangerous product; and (4) Instruction 20 unfairly emphasized the Defendants’ theory of the case.
[¶ 10.] First». Instruction 20 did not misstate South Dakota-strict-liab'ility law. Karsts incorrectly presume that the phrase “defective condition unreasonably dangerous”, is a single element that does not include an unreasonably-dangerous inquiry. ' This Court adopted the rule of strict liability expressed in the Restatement (Second) of Torts § 402A, Peterson v. Safway Steel Scaffolds Co., 400 N.W.2d 909, 912 (S.D.1987). Under this rule, a seller is strictly liable for physical harm caused by a product in a defective condition unreasonably dangerous to the user or consumer.' Restatement (Second) of Torts § 402A. The rule “applies only where the defective condition of the product makes it *610 unreasonably dangerous to the user or consumer.” Id. § 402A cmt. i (emphasis added). Although we have not formally-adopted the Restatement (Third) of Torts: Products Liability (Am. Law Inst.1998),[4] it similarly imposes strict liability for defective design “when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design ..., and the omission of the alternative design renders the product not reasonably safe [.] ” Id. § 2(b) (emphasis added). Thus, both the Restatement (Second) and Restatement (Third) rules contemplate a causal relationship between two elements: a defect must “make” or “render” a product unreasonably dangerous (not reasonably safe). As we have previously said, “[sjtrict liability requires that the product be defective and unreasonably dangerous.” Peterson, 400 N.W.2d at 912 (emphasis added). Numerous courts — in cases involving a variety of products that are not inherently dangerous — agree.[5]
[¶ 11.] Karsts further contend that Instruction 20 was erroneously taken from *611 Restatement (Second) of Torts § 402A comment k, which applies only to products that are unavoidably unsafe (for example, medicines that cause serious side effects but treat deadly illnesses). Karsts point out that the tarp system was not such a product. Instruction 20 was not, however, taken from comment k, Rather, each of Instruction 20’s three sentences finds its origin in Restatement (Second) of Torts § 402A comment i, which states in part:
The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe...'. The article sold must be dangerous to an extent., beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.
(Emphasis added.) Thus, Instruction 20’s first sentence (“A product can be dangerous without being unreasonably dangerous.”) and third sentence . (“A product is not in a defective or unreasonably dangerous condition merely because it is possible to be injured while using it.”) come from the second and third sentences of comment i quoted here. Likewise, Instruction 20’s second sentence (“Even if. a product is defective in some manner, you must find that the defect renders the product ‘unreasonably’ dangerous.”) comes from the first sentence of comment i quoted here. Instruction 20 was not improperly taken from.§ 402A. comment-k language that applies only to products that are unavoidably unsafe.
[¶ 12.] Karsts next contend that additional instructions were required to define unreasonably dangerous.[6] Instruction 21, however, told the jury: “In determining whéther the ... [t]arp system was defective and unreasonably dangerous you may consider whether Shur Co. complied with the generally recognized state of the art — ” Moreover, it is “not error to refuse to amplify the instructions given which substantially cover the principle embodied in the requested instructions.” Degen, 90 S.D. at 407, 241 N.W.2d at 706-07 (quoting Peters v. Hoisington, 72 S.D. 542, 554, 37 N.W.2d 410, 416 (1949)). Here, the root words at issue are reasonable and dangerous. These are ordinary words without unusual legal meaning, and absent a request for a more specific instruction, instructing the jury with ordinary words is generally considered sufficient. See Jorgenson v. Dronebarger, 82 S.D. 213, 218, 143 N.W.2d 869, 872 (1966).[7] Although we *612 think a definition should be given if requested, there was no request for additional specificity in this case.[8]
[¶ 18.] Karsts finally argue that Instruction 20 unfairly emphasized Defendants’ theory of the case. But as we have previously explained, “[s]trict liability requires that the product be defective and unreasonably dangerous.” Peterson, 400 N.W.2d at 912 (emphasis added). Accordingly, Instruction 18 required Karsts to prove both elements: that the tarp system “was in a defective condition which made it unreasonably dangerous ' to Richard Karst[.]” Instruction 20 simply recognized that because both elements were required, it was not sufficient for the jury to determine merely that some danger was attendant to use of the product. Thus, Instruction 20 did not unfairly emphasize a defense theory of the case. Karsts also failed to object to Instruction 20 on this ground. “An attorney must be clear when objecting to jury instructions ‘so the trial court is advised of what possible errors exist and be granted the opportunity to correct any instructions.’ ” Parker v. Casa Del Rey-Rapid City, Inc., 2002 S.D. 29, ¶ 15, 641 N.W.2d 112, 118 (quoting Sundt Corp. v. State By & Through S.D. Dep’t of Transp., 1997 S.D. 91, ¶ 17, 566 N.W.2d 476, 480). Therefore, Karsts waived this argument for appeal.
[¶ 14.] We conclude that when considered as a whole, the instructions correctly stated the law' of strict liability in this jurisdiction. The circuit court did not err in giving Instruction 20.
Summary Judgment — Failure to Warn
[¶ 15.] Summary judgment is appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” SDCL 15-6-56(c). “The evidence must be viewed most favorably to the non-moving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists.” Peters v. Great W. Bank, Inc., 2015 S.D. 4, ¶5, 859 N.W.2d 618, 621 (quoting Saathoff v. Kuhlman, 2009 S.D. 17, ¶ 11, 763 N.W.2d 800, 804). “Entry of summary'judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential" to that party’s case, and on which that party will bear the burden of proof at trial.” Nationwide Mut. Ins. Co. v. Barton Solvents Inc., 2014 S.D. 70, ¶ 10, 855 N.W.2d 145, 149 (quoting Hass v. Wentzlaff, 2012 S.D. 50, ¶ 11, 816 N.W.2d 96, 101). A showing is "not sufficient unless “the party challenging summary judgment substantiate^ its] allegations with sufficient probative evidence that would permit a finding in [its] favor on more than mere speculation, conjecture, or fantasy.” Id. (quoting Quinn v. Farmers Ins. Exch., 2014 S.D. 14, ¶ 20, 844 N.W.2d 619, 624-25).
*613 [¶ 16.] The circuit court granted Wilson’s and Shur’s motions for. summary-judgment on all failure-to-warn claims. The court observed that Karsts did not identify any evidence that Richard ever read the provided warnings. Therefore, the court concluded as a matter of law that Karsts were unable to establish a causal link between the alleged inadequate warnings and Richard’s injury. On appeal, Karsts argue that summary judgment was inappropriate for several reasons. First, they contend that the failure to read 'an irrelevant warning does not bar a failure-to-warn claim. Second, they contend that they presented sufficient evidence to raise a genuine factual dispute whether Richard read the manual. Third,, they contend that Richard is entitled to a presumption that he read the warnings. Fourth, they contend that the failure to read a warning does not’preclude a failure-to-wárn claim alleging improper placement’ of a warning.
[¶ 17.] Karst's first contend that the failure to read an irrelevant warning does not bar a failure-to-warn claim. They assert that the provided warnings were irrelevant because “Defendants did not warn of the hazards associated with removing the sleeve when the tarp was stuck open.” They -also assert that the logic of the, instruction manual was circular:, according to the manual, the first step in converting the system from electric to manual is to “close the tarp,” but the first step in operating the tarp (when the electric system fails) is .to convert the system from electric to manual. Thus, Karsts contend that’notwithstanding the lack of a “causal link between the warnings and the incident, a purported failure to read [irrelevant] warnings ... should not preclude a claim based on the lack of warnings about performing an ‘open tarp’ conversion.” Defendants respond that “it is simply impossible for a plaintiff who cannot prove that he or she ever read and relied upon a warning to show that alleged inadequacies in the warning’s content caused the accident[J”
,.[¶ 18.] Causation is a necessary element of a failure-to-warn claim, whether pursued under a negligence or strict-liability theory. Barton Solvents, 2014 S.D. 70, ¶ 17, 855 N.W.2d at 150-51. In order to prove causation in a failure-to-warn claim, “[a] plaintiff must show that adequate warnings would have made a difference in the outcome, that is, that they would have been followed.” Gen. Motors Corp. v. Saenz ex rel. Saenz, 873, S.W.2d 353, 357 (Tex.1993); see also Payne v. Novartis Pharm. Corp., 767 F.3d 526, 531-32 (6th Cir.2014) (“The key .inquiry is whether, ‘had additional warnings been given, the plaintiff would not have, sustained her .injuries.’ ” (quoting Smith v. Pfizer Inc., 688 F.Supp.2d 735, 746 (M.D.Tenn.2010))). A “[plaintiff’s failure to read the available warning and instruction literature harms the ability to prove that a different warning would have changed his conduct.” 2 David G. Owen & Mary J. Davis, Owen &_ Davis on Prods. Liab. § 11:20 (4th ed.2014). . Therefore, courts generally hold that a plaintiffs failure to .read a given warning precludes establishment of the causation element even if the warning is arguably inadequate. See Johnson v. Niagara Mach. & Tool Works, 666 F.2d 1223, 1225 (8th Cir.1981) (“[A]n issue as to the adequacy of a warming necessarily presupposes that the operator has read the .warning.”); Palmer v. Volkswagen of Am., Inc., 904 So.2d 1077, 1084 (Miss.2005) (“The presence or absence of anything in an unread owner’s manual simply cannot proximately cause a plaintiffs damages.”); Burley v. Kytec Innovative Sports Equip., Inc., 2007 S.D. 82, ¶ 37 n. 7, 737 N.W.2d 397, 410 n. 7 (accepting premise of defendant’s, argument that a student athlete injured by exercise *614 equipment did not read the instruction manual and therefore could not establish proximate cause, but rejecting argument because the athlete’s trainer, who was responsible for and oversaw the athlete’s use of the equipment, had read the manual). The circuit court correctly concluded that Richard’s failure to read the provided warnings would be fatal to a liability theory premised on the content of those warnings because causation could not be established.
[¶ 19.] Karsts alternatively contend that they presented “evidence that, when viewed in the light most favorable to the Karsts, [established that Richard] read the warnings.” It is not disputed that due to the nature of his injury, Richard cannot remember whether he read the provided warnings prior to the accident. Therefore, Karsts rely on the depositions of three other witnesses. First, Wilson’s sales manager, Richard Gase, stated in his deposition that he “would ... tell customers that [he] thought there was very good information in [the] owner’s manual and that it was important to read through it.” Second, one of Karsts’ expert witnesses, Dr. Laughery, opined in his deposition that Richard “was a guy who wasn’t in a hurry ... and ... who, by all the things that I read, was responsible, that had he been given adequate information, adequate warnings, he would have complied with them.” Finally, one of the employees at the grain elevator, Todd Hauck, stated in his deposition that he saw Richard climb up to the work platform on the back of the trailer, climb down and read “something,” ask for a wrench, then climb back up to the platform and release the flex arm from the roll tube.
[¶ 20.] The foregoing evidence was not sufficient to resist summary judgment. “Where the theory of liability is failure to warn adequately, the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning may have prevented the accident before the issue of causation may be submitted to the jury.” Conti v. Ford Motor Co., 743 F.2d 195, 198 (3d Cir.1984); see also Barton Solvents, 2014 S.D. 70, ¶ 10, 855 N.W.2d at 149. Mr. Gase’s statement about unidentified customers and “good information” creates no inference that Richard actually read the specific warnings that are at issue in this case. So also, Dr. Laughery made clear that his opinion whether Richard may have read the supplied warnings prior to the accident was speculative. Dr. Laughery conceded that he was not making any assumptions on whether Richard read the owner’s manual prior to the accident. In fact, Dr. Laughery indicated that Richard’s behavior was typical of someone who either did not recall that the owner’s manual included a section on converting from electric to manual use or someone who had not read the manual in the first place.[9] Finally, Mr. Hauck could not identify what it was that he saw Richard read immediately prior to the accident. Mr. Hauck was not even sure whether the reading material consisted of a book or a single sheet of paper. Even so, Karsts contend an inference that Richard read the manual is warranted by the fact that “¿following the incident[,] the manual for the electric tarp system was not at his home *615 shop where manuals were typically kept.i” However, the search referenced by Karsts did not occur until three and one-half years after the accident occurred. Ultimately, Mr. Hauck’s observation established nothing more than the fact that Richard reading “something.” Thus, Karsts’ evidence was insufficient to create a question of fact for a jury: it did not “permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.” See Barton Solvents, 2014 S.D. 70, ¶10, 855 N.W.2d at 149 (quoting Quinn, 2014 S.D. 14, ¶ 20, 844 N.W.2d at 624-25).
[¶ 21.] Nevertheless, Karsts contend that Richard was entitled to a presumption that he read the provided warnings prior to the accident. They point out that in the context of , moving-vehicle accidents, “[t]here is a presumption, in the absence of evidence to the contrary, that a person killed in an accident was exercising due care for his protection at, and immediately before, the accident.” Dehnert v. Garrett Feed Co., 84 S.D. 233, 236, 169 N.W.2d 719, 721 (1969). They further point out that this presumption has been extended to accidents resulting in amnesic plaintiffs. See Schultz & Lindsay Constr. Co. v. Erickson, 352 F.2d 425, 434 (8th Cir.1965). According to Karsts, “reading warnings is part of the exercise of due care[.]” Therefore, they contend that “the [circuit] court should have applied [a] presumption that [Richard] read the warnings.”
[¶ 22.] The presumption of due care afforded persons injured or killed in moving-vehicle accidents cannot' be extended to create a presumption that Richard read the warning in Shur’s manual. The presumption of due care articulated in' Deh-nert “is based on the natural instinct of self-preservation and the normal disposition to avoid self-destruction, or personal harm.” Dehnert, 84 S.D. at 236, 169 N.W.2d at 721. Therefore, for the presumption to be operative, the injured person must necessarily appreciate the danger inherent in the activity. Yet Karsts concede that “there was no evidence [Richard] knew of the danger of converting from electric to manual with the tarp open.” Additionally, Karsts’ expert witnesses negated the basis for a presumption in cases involving the reading of an instruction manual. Dr. Laughery indicated that most people do not read instruction manuals. 'And Dr. Warren indicated that he agreed with the “general premise” that “most people who purchase products don’t read the owner’s manual.” Thus, the basis for presuming a consumer has read . the warnings in an instruction manual is not present here. We cannot extend the general presumption of due care in operating an automobile to a presumption that Richard read the particular warnings that were given in this case.
[¶ 23.] Karsts finally contend that summary judgment on their inadequate-warning claim was improper because the placement of the warning label on the equipment was inadequate. Karsts submitted an affidavit from Dr. Laughery stating that a label placed on the sleeve of the roll tube “is more likely to be effective.” Karsts claim that even if Richard had not read the manual or label, a jury question existed , as to whether Shur’s placement of the label at the flex arm’s base was inadequate.
[¶ 24.] The “failure to read a warning does not necessarily bar recovery where ... the plaintiff claims inadequate communication of the warning caused the failure to read it.” In re Levaquin Prods. Liab. Litigation, 700 F.3d 1161, 1168 (8th Cir.2012), Karsts’ claim is premised on the affidavit of Dr. Laughery, Defendants asked the circuit court to strike the affidavit. They asserted that it was new opinion evidence submitted after the expert-disclosure deadline for the purpose of avoiding summary judgment. The circuit court denied the motion. On appeal, Defendants continue to assert that Dr. Laughery’s affidavit was improper. Defendants also' assert that even if the affidavit is considered, it is not sufficient to raise a genuine issue *616 of material fact on Karsts’ improper-placement theory.
[¶ 25.] We agree with the circuit court that the affidavit was proper. We acknowledge that “[a]n issue of material fact will not be created by a party who attempts to change its testimony without an explanation for its change or a showing that its answers were ambiguous and that the new affidavit merely seeks to clarify that testimony.” DFA Dairy Fin. Servs., L.P. v. Lawson Special Tr., 2010 S.D. 34, ¶ 21, 781 N.W.2d 664, 670. But this rule contemplates “a substantial change in testimony!,]” id., and it'is meant to prevent a party from “creating] issues of material fact by contradicting his own earlier" sworn testimony[,]” Guilford v. Nw. Pub. Serv., 1998 S.D. 71, ¶ 12, 581 N.W.2d 178, 181. Here, Defendants have not directed our attention to any unexplained contradictions between Dr. Laughery’s affidavit and his earlier statements. Therefore, the court’s consideration of the affidavit was proper.
[¶ 26.] Nevertheless, Dr. Laughery’s affidavit was not sufficient to raise a genuine issue of material fact regarding an improper-placement theory. According to Karsts, Dr. Laughery expressed an “opinion that a warning should have been located on- the sleeve covering the spline where a user would see it during the conversion process.” At oral argument, Karsts also asserted that an inadequate-warning opinion was given in both Dr. Laughery’s report and deposition. Based on the report, the deposition, and the affidavit, Karsts contend that they “presented evidence that the warning was improperly located[.]” Shur responds that Dr. Laughery’s "affidavit did not express an opinion “that placing the label at the base of the flex arms was inadequate,” Wilson responds that Dr. Laughery “did not criticize the location of the warning label in his report or during his deposition.” Karsts reply that such arguments “elevate[]- form over substance.”
[¶27.] “Those resisting summary judgment must show that they will be able .to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof.” Barton Solvents, 2014 S.D. 70, ¶ 16, 855 N.W.2d at 150 (emphasis omitted) (quoting Chem-Age Indus., Inc. v. Glover, 2002 S.D. 122, ¶ 18, 652 N.W.2d 756, 765). In a failure-to-warn case, the plaintiff must “identify specific, affirmative evidence indicating that the ,,. warnings were inadequate.” Id. ¶ 22, 855 N.W,2d at 152 (emphasis added). Dr. Laughery’s evidence did not meet that standard. Although Dr. Laughery’s affidavit mentions the placement of the supplied warnings, the affidavit only offers an inadequacy opinion on the issue of warning content. Additionally, the introduction and conclusion of. the affidavit indicate Dr. Laughery was responding to the question whether Richard read the warnings that were given. Ultimately, instead of opining that the placement of the warning label was inadequate, Dr. Laughery went no further than to express an opinion that an additional warning may have been “appropriate.” He stated:
In this case it would have been appropriate for a warning relating to the. hazards of concerting the tarp from electric to manual use to be placed up .on the sleeve that covered the spline that needed to be accessed during the conversion. An appropriately designed warning positioned on the sleeve is more.likely to be effective because it is going to be encountered at the time of the conversion.
Further, we find no inadequacy-of-placement opinion in Dr. Laughérys deposition or report.
[¶ 28.] As the nonmoving party, Karsts “may only avoid [properly supported] sum *617 mary judgment’ by ‘setting forth specific facts showing that there is a genuine issue for trial.”’ Gades v. Meyer Modernizing Co., 2015 S.D. 42, ¶7, 865 N.W.2d 155, 158 (quoting SDCL 15-6-56(e)) (emphasis added). Dr. Laughery’s statement about what might be an appropriate placement is not equivalent to the requisite opinion that the location of the provided warning label was actually inadequate; Therefore, Karsts did not meet their responsive summary-judgment burden.[10] See Barton Solvents, 2014 S.D. 70, ¶ 18, 855 N.W.2d at 151 (affirming summary judgment bn a failure-to-warn claim because plaintiff did not identify any evidence or expert testimony indicating that the provided warnings were “inadequate”).
[¶ 29,] Summary judgment was correctly granted on Karsts’ failure-to-warn claims involving both content and placement theories. Karsts did not present evidence sufficient for a jury to infer that Richard read the provided warnings prior to the accident, and there is no presumption that he did. Without such evidence, Karsts could not meet their burden of establishing causation between the alleged deficiencies in. the content of the provided warnings and the injury Richard suffered as a result of the accident. Karsts also failed to provide expert testimony establishing that the provided warnings were inadequately placed. Therefore, the circuit court did not err in granting Defendants summary judgment on Karsts’ failure-to-warn claims.

Assuniption-of-risk Defense

[¶30.] At trial, Defendants asserted they could not be held liable for Richard’s injuries because he assumed the risk of injury. “[A] person assumes the risk of injury when the person: ‘(1) [has] actual or constructive knowledge of the risk; (2) appreciate^] its character; and (3) voluntarily aeeept[s]' the risk, with the time, knowledge, and experience to make an intelligent choice.’ ” Duda v. Phatty McGees, Inc., 2008 S.D. 115, ¶ 13, 758 N.W.2d 754, 758 (quoting Ray v. Downes, 1998 S.D. 40, ¶ 11, 576 N.W.2d 896, 898). According to Karsts, the circuit court erred in instructing the jury on assumption of the risk because “there was no evidence [Richard] knew of the danger of converting from electric to manual with the tarp open.” Defendants argue that there was sufficient evidence' to present the defense to the jury. Defendants also argue that this issue is moot' because the *618 special-verdict form indicates the jury never reached the issue of assumption of the risk.
[¶ 31.] Karsts argue that under Instructions 23 and 27, “the jury considered the assumption-of-risk defense in making its negligence determination.” Instruction 23 stated, in part: “If a person assumes the risk of injury or damage, the person is not entitled to any recovery.” Instruction 27 stated, in part:
The issues to be determined by you with regard to Richard Karst’s negligence claim against Shur Co. are these:
First, did Richard Karst assume the risk of injury or damage?
If you find Richard Karst assumed the risk, you will return a verdict for Shur Co, If you find Richard Karst did not assume the risk, you have a second issue to determine, namely:
Was Shur Co. negligent?
This latter instruction indicated that the jury should consider assumption of the risk before considering the question of the defendant’s negligence. Therefore, Karsts contend that “[t]he jury’s verdict finding that Shur-Co was not negligent ... did ‘consider’ and ‘depend on’ the assumption-of-risk defense.”.
[¶ 32.] Although Instructions 23 and 27 — taken alone — might suggest the jury considered assumption of the risk, all of the jury instructions, including the special-verdict form, must be read together. And any question that the jury might have considered the assumption-of-risk defense is dispelled by examining the special-verdict form. The special-verdict form required the jury to address these claims and defenses in a precise sequence. The form’s introduction stated: “Please answer the following questions in the order in which they appear.... Carefully follow the instructions which appear after each question, and do not answer any question that you are instructed to not answer or skip.” Question one asked the jury to decide whether Defendants were strictly liable for defective design. Question two asked the jury to decide whether Shur was liable for negligence. At the end of the second question, the form instructed: “If you did not find in favor of [Karsts] on either Question 1 or question 2, you are finished and should not answer any other questions. Have the foreperson sign and date the verdict form.” The special-verdict form does not mention assumption of the risk until question five. In accordance with these instructions, the jury found in favor of Defendants on both questions one and two, marked the special-verdict form accordingly, and dutifully refrained from answering any other questions — including question five on Defendants’ assumption-of-risk defense.
[¶ 33.] “Juries are presumed to follow instructions of the [circuit] court.” Bland v. Davison Cty., 1997 S.D. 92, ¶ 15, 566 N.W.2d 452, 457. The special-verdict form prohibited the jury from considering assumption of the risk unless it had already determined that Karsts had met their burden of establishing the elements of negligence. Therefore, we must presume that the jury did not consider assumption of the risk. This issue is moot.
Karsts ’ Assumption-of-risk Evidence
[¶ 34.] Because the circuit court granted summary judgment on all failure-to-warn claims, the court concluded that the provided warnings were irrelevant and the court excluded evidence of those warnings at trial. Karsts argue that regardless of our decision on their appeal of the summary judgment dismissing the failure-to-warn claims, “evidence related to manuals, labels, and instructions should have been admitted to rebut misleading testimony *619 from defense witnesses and to counter the assumption-of-risk defense.”
[¶35.] The argument for use of the evidence to counter the assumption-of-risk defense is moot. Because the jury did not consider assumption of the risk, Karsts were not prejudiced by their inability to offer rebuttal evidence to the defense. As for impeachment, Defendants contend that any mention of product-warning materials during the trial was error invited by Karsts. Defendants also contend that Karsts were not prejudiced by this testimony.
. [¶ 36.] Karsts argue' that Defendants were allowed to “suggest” that there was a warning and a “safe procedure” communicated to Richard that he failed to follow. However, Karsts do not point to any specific testimony as objectionable. In Karsts’ reply brief, they claim that a new trial is supported by “[t]he misconduct of Shur-Co’s witness — the first to testify— violating defendants’ motion in limine [by] testifying about ... warning[s.]” As Shur points out, however, this claim is misleading. The first witness called at trial was Wade Dangler. Although Dangler was an engineer employed by Shur, he was called to testify by Karsts. More importantly, Karsts’ attorney invited the testimony-to which Karsts now object. Dangler’s testimony regarding warnings came as his answer to Karsts’ counsel’s questions accusing Shur of not telling its customers about the danger of standing on the platform or of removing the sleeve when the tarp was in the open position. The testimony was also Dangler’s answer to Karsts’ counsel’s questions about the warning information that the manual included or failed to include.
[¶ 37.] “[A] party will. not be heard to complain on appeal of errors which he himself induced or provoked the court or the opposite party to commit.” Veith v. O’Brien, 2007 S.D. 88, ¶27, 739 N.W.2d 15, 24 (quoting Taylor Realty Co. v. Haberling, 365 N.W.2d 870, 873 (S.D.1985)). In this case, an in limine ruling prohibited testimony about the- warnings actually provided, but Karsts provoked such testimony by their questioning. We have stated that “when a party through his questions ‘opens the door’ to admission of evidence, the party may not challenge the admission of that evidence.” Id. By extension, a party cannot elicit testimony prohibited by an in limine ruling and then demand that the in limine ruling be set aside in order to introduce evidence to counter that testimony. To hold otherwise would permit a party to unilaterally bypass the in limine ruling.
[¶ 381] Additionally, the court issued a curative instruction. Instruction 15A stated: “You should not consider whether there are any warnings, labels, or owner’s manuals that may pertain to any of the issues you are being asked to decide. I have ruled that these matters are not relevant to the parties’ claims.” As with other instructions, “we presume that juries understand and abide by [curative] instructions.” Baddou v. Hall, 2008 S.D. 90, ¶ 15, 756 N.W.2d 554, 559. Therefore, the circuit court did not err by refusing to admit evidence of the provided warning’s.
[¶ 39.] Affirmed.
[¶ 40,] GILBERTSON, Chief Justice, and SEVERSON, Justice, and PORTRA, Circuit Court Judge, concur,
[¶ 41.] KERN, Justice, concurs in part and dissents in part.
[¶ 42.] PORTRA, Circuit Court Judge, sitting for. WILBUR, Justice disqualified.

. In this opinion, Richard ánd Susan will be referred to individually by their first names or collectively as "Karsts.” Shur Company and Wilson Trailer Company will be referred to individually as "Shur” and "Wilson,” respectively, or collectively as "Defendants.”

. This ruling has not been appealed.

. By notice of review, Wilson also raised the question whether the circuit court erred in finding-that Wilson was an "assembler” within the meaning of SDCL 20-9-9. Because we affirm the circuit court’s decision in all other respects, we do not reach this issue.

. The dissent argues that we should adopt the risk-utility balancing test from the Restatement (Third) of Torts: Products Liability § 2, cmt, f. Alternatively, the dissent argues that we should overrule First Premier Bank v. Kolcraft Enterprises, Inc., 2004 S.D. 92, ¶ 29, 686 N.W.2d 430, 445, superseded on other grounds by rule, Supreme Court rule 06-67, as recognized in In re Estate of Duebendorfer, 2006 S.D. 79, ¶ 19 n. 4, 721 N.W.2d 438, 444 n. 4, to the extent it may be interpreted to prohibit giving both the risk-utility and consumer-expectation tests. The dissent finally suggests that another “feasible option” may be adopting the modified consumer-expectation test set forth in Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 694 A.2d 1319, 1330-35 (1997). See Dissent ¶¶ 48-53. We agree that the Kolcraft language — unqualifiedly indicating that the risk-utility and consumer-expectation tests are alternative rather than cumulative requirements for proving a product is in a defective condition unreasonably dangerous— should be revisited. But that language is not germane to Karsts’ assertion of error. Karsts’ objection is to other language in Instruction 20- that is found in a different part of the Kolcraft instruction, and that language was not discussed in Kolcraft. More importantly, no party has argued for the dissent's various suggestions. Without the benefit of briefing and argument, we must wait for an appropriate case to consider such significant changes in our products-liability jurisprudence.

. See, e.g., Pritchett v. Cottrell, Inc., 512 F.3d 1057, 1063 (8th Cir.2008) (ratchet system used to tie automobiles to trailer); McMahon v. Bunn-O-Matic Corp., 150 F.3d 651, 657 (7th Cir.1998) (coffee maker and Styrofoam cup); Purvis v. Consol. Energy Prods. Co., 674 F.2d 217, 222 n. 10 (4th Cir.1982) (curing barn); Bruce v. Martin-Marietta Corp., 544 F.2d 442, 447 (10th Cir.1976) (aircraft); Dart v. Wiebe Mfg., Inc., 147 Ariz. 242, 709 P.2d 876, 878 n. 1 (1985) (en banc) (paper shredder and conveyor belt); Mason v. Mitcham, 2011 Ark. App. 189, 382 S.W.3d 717, 719 (Ark.Ct.App.2011) (double-bunk trailer); Union Supply Co. v. Pust, 196 Colo, 162, 583 P.2d 276, 282 n. 5 (1978) (en banc) (conveyor belt); McBride v. Ford Motor Co., 105 Idaho 753, 673 P.2d 55, 64 (1983) (branch-chipping machine); Sollami v. Eaton, 201 Ill.2d 1, 265 Ill.Dec. 177, 772 N.E,2d 215, 219 (2002) (trampoline); Ford Motor Co. v. Rushford, 868 N.E.2d 806, 810 (Ind.2007) (failure to warn regarding automobile air bags); Aller v. Rodgers Mach. Mfg. Co., 268 N.W,2d 830, 834 (Iowa 1978) (saw); Gaumer v. Rossville Truck & Tractor Co., Inc., 292 Kan. 749, 257 P.3d 292, 301 (2011) (hay baler); Lloyd v. Gen. Motors Corp., 397 Md. 108, 916 A.2d 257, 272 (2007) (automobiles); Halliday v. Sturm, Ruger & Co., Inc., 368 Md. 186, 792 A.2d 1145, 1150 (2002) (firearms); Moore v. Ford Motor Co., 332 S.W.3d 749, 760 (Mo.2011) (en banc) (automobiles); Rivera v. Philip Morris, Inc., 125 Nev. 185, 209 P.3d 271, 275 (2009) (cigarettes); Johnson v. Ford Motor Co., 45 P.3d 86, 91 n. 12 (Okla.2002) (automobiles); Gann v. Anheuser-Busch, Inc,, 394 S.W.3d 83, 88 (Tex.Ct.App.2012) ("longneck” beer bottle); Seattle-First Nat'l Bank v. Tabert, 86 Wash.2d 145, 542 P.2d 774, 779 (1975) (en banc) (automobiles); Haase v. Badger Mining Corp., 274 Wis.2d 143, 682 N.W.2d 389, 395 (2004) (silica sand).
Several courts have reached the opposite result. See Cronin v. J.B.E, Olson Corp., 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153, *611 1163 (1972) (en banc); McAlpine v. Rhone-Poulenc Ag Co., 304 Mont. 31, 16 P.3d 1054, 1057-59 (2000); Freund v. Cellofilm Props., Inc., 87 N.J. 229, 432 A.2d 925, 931 (1981). However, Karsts do not cite these cases, similar cases, or any other authority suggesting that we abandon the Restatements’ causality requirement.

. Karsts also contend that this opened the door to prejudicially misleading arguments by Defendants. However, Karsts did not object to the admission of the evidence forming the basis for those arguments or the arguments themselves. Wé therefore decline to consider this contention on appeal.

. Although most states provide some definition of the term unreasonably dangerous for the jury, Nesselrode v. Exec. Beechcraft, Inc., 707 S.W.2d 371, 378 n. 41 (Mo.1986) (en banc), Missouri provides "no judicial definition" for the term whether derived from the consumer-expectation test, the risk-utility test, or otherwise. Rodriguez v. Suzuki Motor Corp., 996 S.W.2d 47, 65 (Mo.1999) (enbanc). The Missouri Supreme Court reasoned that the "virtue of such a general instruction is that it allows the jury to give the concept of unreasonable danger content ‘by applying .their collective intelligence and experience to .the broad evidentiary spectrum of facts and circumstances presented bythe parties.’ ” Id. (quoting Newman v. Ford Motor Co., 975 *612 S.W.2d 147, 154 (Mo.1998) (en banc)). "Furthermore, the perceived need to define ‘unreasonable dangerousness’ is largely satisfied by allowing the litigants ‘to argue that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence.’ ’’ Id. (quoting Newman, 975 S.W.2d at 154).

. If a request is made in an appropriate case, the following Restatement (Second) of Torts § 402A (1965) comment i language should be given: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.”

. In his deposition, Dr. Laughery was asked: “So are you assuming that [Richard] had not read the owner’s manual before the accident?” Dr. Laughery replied: “I’m making no assumption on that. But if his — there’s no indication that he did read the owner's manual or that he remembered there being a section on page 17 about the conversion, that his behavior would be typical with respect to that.”

. Karsts contend that the language in Dr. Laughery’s affidavit, deposition, and report is sufficient to conclude that he thought the placement of the warning was inadequate. According to Karsts, to hold otherwise would be to require ■ "magic language.” We disagree. Dr. Laughery was an experienced expert who had authored or edited three books . on warnings, authored one book on information technology, and authored or co-authored over 150 articles. He had also testified in state and federal courts across the country. Moreover, he clearly demonstrated his ability to give an opinion to the requisite degree of certainty when he believed a warning was inadequate. For example, in Dr. Laughery’s deposition; he expressed an inadequate-content opinion, stating:
The label fails, in that it simply sends the user to the owner’s manual for instructions. The label doesn’t contain any instructions about tying down or any of these other ways that it might have been prevented, whatever they might be.
Further, later in Dr. Laughery’s deposition, he specifically opined on the content of the provided warnings, describing them as inadequate. In contrast, on the issue of placement, his affidavit merely comments that the placement of a warning on the sleeve would have been appropriate and more likely to be effective than the label actually supplied. However, simply indicating that Placement 1 is appropriate or better than Placement 2 does not establish that Placement 2 is inadequate unless it is also established that Placement 1 is the minimum standard.